OPINION OF THE COURT
Howard F. Trussel, J.
Petitioner brought this holdover proceeding returnable on December 29, 1989 seeking:
1. to evict respondents Rosa Valcarcel (Rosa), Lourdes DelValle (Lourdes), and Martin Valcarcel (Martin) from apartment 3K, located at 15 Marcy Place, Bronx, New York (premises), pursuant to RPAPL 711 (1) and (5), on the ground that the respondents are objectionable because they used or condoned the use of part of the premises 15 Marcy Place, Bronx, New York, for the purpose of illegal trade or other illegal business;
2. a judgment of possession against respondent Rosa Valcarcel, the tenant herein, for harboring her two children Lourdes and Martin in the premises;
3. a judgment for the fair market value for tenant’s use and occupancy of subject premises from November 20, 1989 to the date of the trial, which was held on April 6, 1990 (it is noted that the last memorandum of law was submitted to this court on May 7, 1990);
4. a restraining order or protective order against the three respondents pursuant to CCA 110 (a); RPAPL 715 (1); Administrative Code of the City of New York § 27-2121; and 21 USC §§ 845a and 845b, as amended.
After conducting a trial and a thorough review of the record and exhibits, the court finds the following to be the facts in this matter.
FACTS
A brother, Martin Valcarcel, age 17, and his half-sister, Lourdes DelValle, age 23, were both arrested for the illegal sale of drugs. Martin was arrested on December 5, 1988, in the lobby of 15 Marcy Place, Bronx, New York. Lourdes was arrested on June 6,1989, in front of the same building.
The arresting officer and Rosa Valcarcel were the only witnesses who testified in this proceeding.
At the time of his arrest, Martin lived at said premises, with his mother Rosa. After his arrest he served one year in *912 jail. Subsequently he returned to live with his mother and did so until one month prior to the date of this trial. Rosa testified and gave her reason for taking Martin back into her apartment after said arrest and incarceration: "I couldn’t just let him go into the street just like that.”
At the time of her arrest, Lourdes informed the police officer that she lived at subject premises. The record indicates that she no longer lives there. Up to the date of trial of this civil proceeding, Martin visited his mother Rosa at the premises about once or twice a week, and Lourdes made her visits about every week.
STATUTES TO SUPPORT EVICTION
RPAPL 711 reads, in part:
"A tenant * * * shall not be removed from possession except in a special proceeding. A special proceeding may be maintained under this article upon the following grounds:
"(1) A proceeding seeking to recover possession of real property * * * if he deem the tenant objectionable, shall not be maintainable unless the landlord shall by competent evidence establish to the satisfaction of the court that the tenant is objectionable. * * *
"(5) The premises, or any part thereof, are used or occupied as a bawdy-house, or house or place of assignation for lewd persons, or for purposes of prostitution, or for any illegal trade or manufacture, or other illegal business.”
A PERSON HARBORING AN ILLEGAL TRADER IS PUNISHED AS A PRINCIPAL
One who aids and abets a person who has possessed, distributed and sold an illegal drug is punishable as a "principal”. (See, United States v Falu, 776 F2d 46 [2d Cir 1985].) This court holds that one who harbors a person in a premises or any part thereof in which an illegal drug was sold is punishable as a "principal”.
LAW TO SUPPORT A RESTRAINING ORDER
CCA 110 (c) reads, in part: "Regardless of the relief originally sought by a party the court may recommend or employ any remedy, program, procedure or sanction authorized by law for the enforcement of housing standards, if it believes they will be more effective to accomplish compliance or to *913 protect and promote the public interest * * *. The court may retain continuing jurisdiction of any action or proceeding relating to a building until all violations of law have been removed.”
Administrative Code §27-2121 provides: "the court, on motion of any party or on its own motion, may issue such preliminary, temporary or final orders requiring the owner of property or other responsible person to abate or correct violations of this code * * * or to take such other steps as the court may deem necessary to assure continuing compliance with the requirements of this code”.
In October 1984 a Federal law was enacted which imposed double penalties of fine and imprisonment for the distribution or manufacture of a controlled substance in or within 1,000 feet of a public or private school, college or university. (21 USC § 845a.) The United States Court of Appeals for the Second Circuit upheld the constitutionality of section 845a in the case of United States v Falu (supra). (See, Kohn, Stiff Penalties Upheld for Sale of Narcotics Near Schools, NYLJ, Nov. 8, 1985, at 1, cols 3, 4.) Said section 845a was amended by Public Law 100-690 on November 18, 1988:
"SEC. 6458. PLAYGROUNDS, YOUTH CENTERS, SWIMMING POOLS AND VIDEO ARCADES.
"(a) Sections 405A (a) and (b) of the Controlled Substances Act (21 U.S.C. 845a (a) and (b)) are amended by inserting ', or within 100 feet of a playground, public or private youth center, public swimming pool, or video arcade facility,’ after 'university’.” (102 US Stat 4373.)
On appeal from an order of the Supreme Court, New York County, the Appellate Division found that where a court order prohibits a defendant from conducting any activities on the roof of certain premises, and the court finds the defendant violated such order, then the court may impose a sanction for civil contempt. (Seril v Belnord Tenants Assn., 139 AD2d 401.)
In People v Ricardo B. (73 NY2d 228 [1989]), Ricardo B. appealed a jury verdict adjudicating him as a youthful offender and folding him guilty of criminally negligent homicide on the ground that the procedure employed by the trial court in trying him and the codefendant together before separate juries was unauthorized and unconstitutional. The Court of Appeals affirmed the adjudication and used language applicable to this court’s employing the restraining order herein: "That the procedure chosen to further the legislative purpose *914 was novel did not render it improper. The courts may adopt new procedures which are fair and which facilitate the performance of their responsibilities (see, Judiciary Law § 2-b [3] ["A court of record has power * * * to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it”])” (supra, at 233).
A RESTRAINING ORDER WILL PROTECT THE TENANTS, LANDLORD AND THE BUILDING,
AND HOPEFULLY, OVER TIME, REDUCE THE COURT’S CASELOAD
A police officer while discussing drug dealers said: "We just brought in four of them. Come back tomorrow, and you’ll see them out there again. It’s ridiculous. * * * Police sweeps have driven trafficking indoors. * * * Often the poor tenants are afraid to report drug crimes and are susceptible to hush money. Then the drug merchants take over, turning the city-provided haven into a new form of 'hell’.” (New York Times, June 25, 1987.)
The following situations are known to exist in The Bronx: landlords on their own initiative or upon request of the Bronx District Attorney bring eviction proceedings against illegal drug dealers at considerable cost to them for legal services. After an illegal drug dealer is evicted he/she remains in the same building by (a) buying another apartment from another tenant, or (b) paying a tenant in another apartment daily for the use of said apartment, or (c) intimidating and coercing a tenant to permit the criminals to use his/her apartment for illegal drug trafficking. Some of them take over a store or a one-family house and operate their illegal trade from there.
A restraining order should render it unnecessary to litigate the issue of illegal drug dealing against the same trafficker and in the same area anew, time and time again. There would be no need to prove an illegal trade when contempt of a restraining order could be utilized instead. This would save manhours expended by undercover policemen and others. When this procedure is employed it could protect the public and building in the area of the crime. It could also reduce the caseload of illegal drug proceedings in various courts; for many drug criminals have pleaded guilty to their offenses in criminal court only to come into the Housing Narcotic’s Part to defend the actions to evict them. Once they are evicted judicial time will be saved by said restraining order. "In this *915 day of massive caseloads and an overburdened criminal justice system judicial economy is not a negligible consideration”. (See, People v Ricardo B., supra, at 235.)
In addition to the news release about the police officer referred to above, there are other releases on this subject that are significant, and they are quoted:
Statements by Presiding Justice Francis T. Murphy of the Appellate Division, First Department, published in the New York Times on March 24, 1984 (at 25), and in the New York Law Journal on March 10, 1987.
"Government has no more essential duty than the protection of the lives of its people. Fail in this, and it fails in everything. * * *
"During the 1984-1985 school year, nearly 6,000 persons were arrested in New York City for narcotics sales to school children. About 60 percent of those arrests were made in or within two blocks of elementary schools. The primary target of many of the narcotics sellers were children aged five to eleven.” (Murphy, What Kind of People Have We Become, NYLJ, Mar. 10, 1987, at 3, cols 1, 3.)
From the New York Times: "it’s odd that New York City would tolerate the loss of apartments to drug dealers. * * * Dealers often set up shop in buildings taken over by the city”. (June 25,1987, at A26.)
The City of New York, Department of Housing Preservation and Development (HPD), in its news release, dated July 22, 1987, asserted, in part: "HPD found that 38 apartments cannot be rented because the buildings they are in are occupied by drug dealers, making rental dangerous to the families that would normally move in.” The following is quoted from page 3 of a publication by the New York State Bar Association, dated September 22, 1989, entitled "Residential Landlord and Tenant Practice Update”:

"DRUG RELATED CASES

"1. Introduction — The 'crack epidemic’ has spawned a spate of crime and associated violence that has dramatically impacted on the quality of residential housing throughout the country, particularly in urban centers like the City of New York.
"A. Public Policy Considerations:
"Drug Abuse in a community threatens the very fabric of *916 society by undermining social morals and values, and affecting its citizens and eroding its neighborhoods. Drug abuse very often reaches vulnerable children because they are easy 'targets.’
"The use of real property for illegal purposes such as the sale and use of illegal drugs if unchecked will flourish and irreparably affect the entire neighborhood by disrupting its tranquility and increasing the crime rate in the area. If this condition is allowed to continue residents will abandon the neighborhood and the criminal elements will take over. This will lead to the degeneration of the neighborhood.
"Kellner v. Cappelini, 135 Misc. 2d 759, 516 NYS2d 827 (Civ. Ct. N.Y. Co. 1986) (per Tom. J.)
" 'The presence of drug pushers in residential buildings is intolerable,’ Justice Milton Williams, Administrative Judge for the Courts of the City of New York.
"Chan v. Rivera, NYLJ, 5/15/89, p. 26, col. 4 (Kings Co. Civ. Ct., Trial Term; Pt. 13) (per Harkavy, J.)
"B. In response to the explosion of drug use, and the accompanying adverse impact on residential neighborhoods, the Administrative Judge of the City of New York has established special Narcotics Eviction Drug Parts in several counties to expedite the processing of drug eviction cases, effective August 1,1988. Manhattan Lawyer, August 2, 1988, page 3.”
This court holds that respondent Rosa Valcarcel is an objectionable tenant by condoning the illegal trade of drugs engaged in by her two children, Lourdes Del Valle and Martin Valcarcel, in part of the premises in which she lives, in violation of the law cited on page 911, herein; and by harboring said two children after being informed of their illegal trading in narcotics; and her eviction as well as the eviction of said two children are hereby ordered on terms set forth below.
It is important for the members of our society to be protected from persons, who, after trial, have been proven to be an illegal drug dealer, or have been proven to be aiders or abettors for illegal drug dealers. It is therefore
Ordered, adjudged and decreed that the respondents Rosa Valcarcel, Lourdes DelValle and Martin Valcarcel are permanently enjoined and restrained from appearing in or at subject premises, to wit: 15 Marcy Place, Bronx, New York, and/or within 1,000 feet of said premises; and said respondents are likewise, permanently enjoined and restrained from appearing within 1,000 feet of the schools nearest the subject premises, and are permanently enjoined and restrained from appearing *917 within 100 feet of a playground, public or private youth center, public swimming pool or video arcade.
It is further ordered, adjudged and decreed that in the event there should be a violation of this restraining order,
1. The police department may be requested to enforce this restraining order by arresting the respondent and bringing said respondent before this court for a trial, and
2. The respondent may be held in contempt of court, and
3. The respondent may thereafter be enjoined from appearing within an enlarged area as determined by the court.
It is further ordered, adjudged and decreed that a copy of this restraining order shall be sent by the clerk of the Housing Court, Part 18B, to the District Attorney of Bronx County, for appropriate action, if any.
In view of the aforementioned considerations, this court hereby enters a final judgment of possession in favor of the landlord and against the respondents, Rosa Valcarcel, Lourdes Del Valle and Martin Valcarcel. This court authorizes the issuance of a warrant forthwith. The execution of the warrant is hereby stayed five days calculated from the day a copy of this decision and order and restraining order is served upon the attorney for Rosa Valcarcel, the tenant of record herein. Lourdes Del Valle and Martin Valcarcel can be served personally or served by registered mail, return receipt requested.
In addition, final judgment for use and -occupancy that remains unpaid up to the date of trial will be entered only after the landlord submits an affidavit of unpaid moneys with a notice of settlement served upon the attorney, for respondent, Rosa Valcarcel.
It is suggested that all the respondents enroll in a rehabilitation and family counseling program and complete it, as an important step to keeping the family constructively together; thereby preventing a repetition of the events set forth herein. In this way, an example might be established with this family to show that attending and completing a rehabilitation and family counseling program will, in fact, reduce the illegal sales and consumption of narcotics.
In the event there are children in this apartment at the time of the issuance of a warrant herein, an application should be made by the respondents or their attorney to the Bureau of Child Welfare for assistance in enrolling in such a program.